## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 26 2016, 8:42 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael P. DeArmitt
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorney Generals
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: R.H., C.H., and M.H.

K.G. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

April 26, 2016

Court of Appeals Case No. 03A01-1509-JT-1535

Appeal from the Bartholomew Circuit Court

The Honorable Stephen R. Heimann, Judge

The Honorable Heather M. Mollo, Magistrate

Trial Court Cause Nos.
03C01-1409-JT-4030
03C01-1409-JT-4031
03C01-1409-JT-4032

**Pyle, Judge.**

# Statement of the Case

K.G. ("Mother") appeals the termination of the parent-child relationship with her children, R.H., C.H., and M.H., claiming that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that there is a reasonable probability that (1) the conditions that resulted in the children's removal or the reasons for placement outside the parent's home will not be remedied, and (2) that a continuation of the parent-child relationship poses a threat to the children's well-being. Concluding there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm.

We affirm.

# Issue

Whether there is sufficient evident to support the termination of the parent-child relationship.

# Facts

At approximately 8:00 p.m. on May 12, 2013, law enforcement officers were dispatched to Mother's home after receiving a report that her children, six-year-old R.H., two-year-old C.H., and one-year-old M.H. were not being supervised. When the officers arrived at the scene, they had to wake Mother, who told the officers that she had taken two Klonopin tablets at 1:30 p.m. and had been sleeping since that time. R.H. and C.H. were playing unsupervised, and M.H. was crying in her crib. The officers noticed an empty prescription bottle of

hydrocodone that had been filled the day before. Mother did not know where the pills were but thought they could have been stolen. Mother was arrested and charged with neglect of a dependent. Her drug screen was positive for oxycodone, hydrocodone, and cocaine. Father was incarcerated at the time for convictions related to sexual misconduct with a minor. Because Mother and her children lived with Mother's mother and stepfather, officers made arrangements for the children to stay in the home with their grandparents.

[4] Two days later, DCS filed a petition alleging that R.H., C.H., and M.H. were children in need of services ("CHINS"). In June 2013, Mother stipulated that her children were CHINS and reached an agreement with DCS as to services. The trial court's dispositional order required Mother to (1) complete an intensive outpatient drug program ("IOP"); (2) participate in home-based case management services to address housing, employment, substance abuse, and parenting, and follow all recommendations; (3) attend supervised visitation; (4) participate in individual therapy to address depression; (5) participate in and complete the *Moving On* program;[1] (6) comply with the terms of probation; (7) maintain suitable housing; (8) secure a legal and stable source of income; (9) abstain from using drugs and controlled substances without a prescription; and (10) submit to random urine drug screens.

---

[1]Mother described the *Moving On* program as a "program to help women move on from bad situations, circumstances, teach you coping skills to move past those." (Tr.37).

[5]     When Mother failed to engage in services as ordered, DCS filed a petition to terminate her parental rights in September 2014. A hearing on the petition was held on February 6, 2015, and March 9, 2015. Evidence at the February hearing revealed that Mother began an IOP program in May 2013 and was diagnosed with multiple drug dependence and an opioid induced mood disorder. She was discharged from the program in August 2013 because of several positive drug screens. Mother was incarcerated in July and August 2013 and again from September to November 2013 for driving while suspended, criminal trespass, and conversion. After her release in November, Mother failed to follow procedures to be readmitted to the IOP program. DCS referred Mother to another IOP program in April 2014. At the hearing, IOP substance abuse counselor Craig Lubbe ("Lubbe") testified that Mother began a second IOP program in April 2014, but she did not complete it. Mother used alcohol three times during the program, and Lubbe opined that Mother's ability to stay drug-free was at risk and that her ability to properly parent her children was a concern.

[6]     Mother's home-based care service worker since May 2013, Ann Moore ("Moore"), testified that the goals of the program were to provide Mother with employment, community resourcing, housing and parenting skills. During the fifteen months that Moore worked with Mother, Mother showed no employment or housing stability. Moore testified that, based on what she had seen from Mother over the previous year, she did not believe Mother had the ability to accomplish the goal of stability in the foreseeable future.

[7]     Mother's DCS case manager, Kate Penn, ("Penn") testified regarding Mother's difficulties during supervised visitation. Specifically, Penn testified that in July 2014, there was a "drastic decline in visits all of the sudden [and Mother] was losing her patience more often." (Tr. 245). During one visit, Mother's first comment to M.H. was that she was going to "whoop her ass." (Tr. 245). Penn also testified that in the previous few months, Mother had been more interested in her phone than her children. During one visit, R.H. had to yell at Mother four times to get her attention. In addition, Penn testified that R.H. needs to have stability as well as clear and concise expectations that Mother has never been able to provide. Penn had also seen a drastic improvement in the behavior of C.H. and M.H. with their foster parents. Penn recommended the termination of Mother's parental rights and adoption as a plan for all of the children.

[8]     CASA Jacki Mann ("Mann") also recommended the termination of Mother's parental rights. Specifically, Mann testified that Mother had not met any of her goals. She did not have stable employment or housing, and her parenting skills were not to the level of adequately caring for her children.

[9]     DCS case manager Amy Pawlus ("Pawlus") testified regarding the impact of Mother's actions on R.H.'s well-being. Specifically, Pawlus testified that while R.H. lived with Mother, he saw sexual activity, criminal activity, drug use, and domestic violence. During that time, Mother had failed to provide sufficient supervision and stability to R.H. because of her drug use. R.H. was cruel to

animals, damaged property, set fires, and was suspended from school for fighting and disrupting classes. He also threatened harm to himself and others.

[10] R.H.'s therapist, Christina Harmon ("Harmon"), diagnosed him with oppositional defiant disorder, post-traumatic stress disorder, and attention deficit hyperactive disorder. Harmon testified that the primary focus for R.H. was to find stability for him as quickly as possible. According to Harmon, R.H.'s placement in an unstable environment would only result in R.H.'s continued anger and aggression towards others. With weekly therapy and a structured foster home, R.H. became less angry and aggressive.

[11] At the time of their placement, C.H. and M.H. had unmet medical needs, developmental delays, and behavioral issues. However, at the time of the termination hearing, M.H. had spoken and allowed others to hold her. C.H. had improved his ability to speak so that others were able to understand him, and he had developed a large vocabulary. Moore testified that they were "different child[ren]," (Tr. 226, 227), and attributed these positive changes to the stability of their foster home.

[12] Mother also testified at the February hearing. She explained that she had left the IOP program in April 2014 because she was upset with the facilitator and that she had used marijuana since that time. She admitted that her longest period of employment had lasted only three months, and that she was not currently employed. She did not have stable housing because the house where she lived did not have running water. She also admitted that she had not visited

with all three children since October 2014 and that it was difficult to manage all three children at the same time.

[13] One month later, at the March 9 hearing, Mother testified that she had completed the *Moving Up* program and had a job interview scheduled. She also testified that she had community resources, including AA and NA meetings and an addictions counselor that she had been seeing for three months. She further testified that she had a social support system, which included a friend that she met when she worked at a hotel for four days. In addition, Mother testified that she would be willing to enter an IOP program.

[14] Following the hearing, the trial court issued a detailed twelve-page order terminating Mother's parental rights.[2] Mother appeals.

## Decision

[15] Mother argues that there is insufficient evidence to support the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.,* 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the

---

[2]The trial court also terminated Father's parental rights. Father has not filed an appellate brief in this case.

parents but to protect their children. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[16] When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.,* 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id.* Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-1230.

[17] A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.,* 989 N.E .2d at 1231.

[18] Here, Mother argues that there is insufficient evidence to support the termination of her parental rights. Specifically, she contends that the evidence is insufficient to show that there is a reasonable probability that: (1) the conditions that resulted in her children's removal or the reasons for placement outside the parent's home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to her children's well-being.

[19] At the outset, we note that INDIANA CODE section 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for their placement outside the parent's home will not be remedied.

[20] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration

evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.*

[21] Here, Mother argues that "given the improvements [she] made over the course of her CHINS case with regard to substance abuse, and given the insight she displayed regarding her addiction at the March 9, 2015 hearing, DCS did not meet its burden of clearly and convincingly proving that the conditions that resulted in the children's removal would not be remedied." (Mother's Br. 15). However, our review of the evidence reveals that at the time of the February 6, 2015 hearing, Mother had failed to complete two IOP programs, and her most recent IOP counselor testified that Mother's ability to stay drug-free was at risk. In addition, Mother's counselor was concerned about Mother's ability to properly parent her children, and Mother's home-based care service worker did not believe Mother had the ability to accomplish the goal of stability in the foreseeable future. The DCS case worker and the CASA both recommended termination of Mother's parental rights because she had not met any of her goals and her parenting skills were not to the level of adequately caring for her three children, whose behavioral issues were improving because of the stability of their foster homes. Even Mother admitted that: she (1) had never been employed for longer than three months; (2) lacked stable housing because she had no running water; and (3) found it difficult to manage all three children at the same time.

Mother, however, points to testimony from the second hearing. At that hearing, Mother testified that she: (1) had completed one program; (2) had a job interview scheduled; (3) was seeing an addictions counselor; (4) had a social support system, which included a friend that she met when she worked at a hotel for four days; and (5) would be willing to enter a third IOP program. Mother's reliance on this testimony is misplaced. Trial courts have discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination, and courts may find that a parent's past behavior is the best predictor of his or her future behavior. *E.M.,* 4 N.E.3d at 643. DCS therefore need not rule out all possibilities of change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change. *Id.* The trial court's conclusion that DCS met this burden is not clearly erroneous.

Affirmed.

Kirsch, J., and Riley, J., concur.